IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| T.A.T., | : |
|       Plaintiff, | : |
|       v. | :   Case No. 5:22-cv-00068-CHW |
| COMMISSIONER OF SOCIAL SECURITY, | :   Social Security Appeal |
|       Defendant. | : |

## ORDER

This is a review of a final decision of the Commissioner of Social Security denying Plaintiff T.A.T.'s application for disability benefits. The parties consented to have a United States Magistrate Judge conduct all proceedings in this case, and as a result, any appeal from this judgment may be taken directly to the Eleventh Circuit Court of Appeals in the same manner as an appeal from any other judgment of the United States District Court. Because substantial evidence supports the Commissioner's decision and there were no errors in how the ALJ handled Plaintiff's case, the decision in Plaintiff's case is **AFFIRMED**.

## BACKGROUND

Plaintiff applied for Title XVI disability benefits on August 23, 2019, alleging disability beginning on August 1, 2018, due to depression, bipolar disorder, panic disorder, and memory problems due to physical trauma. (Ex. 1A). After Plaintiff's application was denied initially and on reconsideration at the state agency level of review (Exs. 1A, 3A), Plaintiff requested further review before an administrative law judge (ALJ). The reviewing ALJ held a telephonic hearing on March 23, 2021. (R. 30-55). The ALJ issued an unfavorable opinion on June 2, 2021. (R. 12-29).

1

Plaintiff's request for review of that decision by the Appeals Council was denied on December 20, 2021. (R. 1-6). The case is now ripe for judicial review. *See* 42 U.S.C. § 405(g).

## STANDARD OF REVIEW

Judicial review of a decision of the Commissioner of Social Security is limited to a determination of whether that decision is supported by substantial evidence, as well as whether the Commissioner applied the correct legal standards. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "Substantial evidence" is defined as "more than a scintilla," and as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The Eleventh Circuit has explained that reviewing courts may not decide the facts anew, reweigh the evidence, or substitute their judgment for that of the Commissioner. *Id.* Rather, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if the evidence preponderates against it.

## EVALUATION OF DISABILITY

Social Security claimants are "disabled" if they are unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations outline a five-step sequential evaluation process for determining whether a claimant is disabled: "(1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and

(5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience." *Winschel*, 631 F.3d at 1178 (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v); 416.920(a)(4)(i)-(v)).

## MEDICAL RECORD

Plaintiff treated at River Edge Behavioral Health (REBH) for depression and anxiety. (Ex. 1F, 7F). The earliest treatment in the record stems from early 2014, where Plaintiff started going to REBH after being encouraged by family members who observed her depressive and vegetative state. (Ex. 1F, R. 300-301). She was diagnosed with major depressive disorder and prescribed medications, such as Lexapro and Vistaril, to treat her symptoms. (R. 289). She experienced improvement of her impairments during treatment. *See, e.g.*, (R. 293).

In late September 2017, Plaintiff was hospitalized at REBH after having suicidal ideations with plans either to cut or hang herself. (Ex. 7F; *see, e.g.*, R. 517). At intake, Plaintiff rated her depression and anxiety as 8/10 and admitted that she had not taken any depression medication in two years. (R. 517). Plaintiff discussed using marijuana and alcohol. (R. 490). She was discharged about two weeks later with a diagnosis of major depressive disorder with psychotic features, recurrent episode, and prescriptions for Lexapro, Buspar, Melatonin, and Bactrim. (R. 510-512). Plaintiff was transported to Salvation Army due to unemployment and homelessness. (R. 502). Plaintiff continued treating on an outpatient basis through March 2018, at which time she withdrew from treatment. (R. 436). Later treatment records indicate Plaintiff's belief that REBH discontinued treatment due to Plaintiff's pregnancy. (R. 345, 350).

The record reflects emergency and obstetric treatment at Coliseum Medical Center. (Exs. 4F, 8F). Plaintiff went to the emergency room in February 2018 after falling on some stairs (R. 545), and July 2018 after being physically assaulted by a significant other when she was 10 weeks

3

pregnant. (R. 535). Her history with depression and anxiety was noted at both visits, although no other mental health concerns were documented. (R. 534, 545, 548). Plaintiff underwent a cesarean and voluntary tubal ligation in January 2019. (Ex. 4F).

Plaintiff also treated at First Choice Primary Care. (Exs. 3F, 6F, 9F). Plaintiff re-established herself as a patient in late March and early April 2018 with complaints of pain in her finger, foot, and back since her March fall, depression, anxiety, and insomnia. (R. 350, 353). Plaintiff reported that she was asked to leave treatment at REBH and that she was no longer taking Lexapro. (R. 350). She reported sleep issues related to depression and smoking marijuana to cope with recent stress. (R. 351, 353). Dr. Graves prescribed Venlafaxine Hydrochloride for Plaintiff's depression and anxiety and instructed her to set up an appointment for counseling. (R. 351).

Plaintiff saw a nurse practitioner (NP) in July 2019 at a follow-up appointment for her anxiety and depression. (R. 421). Plaintiff stated that taking Lexapro helped her depression, but she felt that her anxiety was "off the chart." (*Id*.) She described having daily panic attacks, experiencing sleep disturbances, and having crying, irritable, and angry moods. (*Id*.) Plaintiff appeared alert and oriented. (R. 422). Plaintiff's medications were continued, and she received a psychiatry referral. (*Id*.)

At her August 2019 follow-up, Plaintiff showed improvement in her mood and symptoms, although she was still reporting daily panic attacks. (R. 417). This improvement, however, resulted from discontinuing her medications and taking someone else's Venlafaxine, which Plaintiff had not been prescribed. (*Id*.) NP Ausborn explained the dangers of this conduct and instructed Plaintiff to stop taking unprescribed medications. (*Id*.) Nevertheless, because of Plaintiff's positive response to the medication, Plaintiff was prescribed Venlafaxine. (R. 417-418). Plaintiff was scheduled for a psychiatry appointment with Dr. Naqvi in September 2019, and NP Ausborn

encouraged her to keep the appointment. (*Id*.) There are no notes from this scheduled appointment in the record, and agency notes indicate that Dr. Naqvi had not treated Plaintiff. (R. 60, 62).

Plaintiff did not return to First Choice Primary until April 2020, where she saw Dr. Anderson. (R. 413). Notes indicate a diagnosis of and new medication for Bipolar 2 in addition to depression and anxiety. (R. 413-415). Plaintiff expressed depression and anger surrounding not having custody of her baby. (R. 413). Plaintiff saw NP Brooks in early May 2020 and outlined her anger management issues. (R. 407). Her depression was well-managed, but her anger and anxiety were elevated. (*Id*.) Plaintiff explained that when she gets angry, she usually yells, screams, and breaks things. (*Id*.) She reported no problems sleeping or eating. (*Id*.) NP Brooks noted that Plaintiff was well groomed with good hygiene. (R. 408). And although she was tearful and spoke with a flat voice, she made linear and congruent conversation. (R. 408-409). NP Brooks adjusted Plaintiff's medications and referred Plaintiff to REBH for a psychiatry appointment. (R. 409-410). At a follow-up two weeks later with NP Brooks, Plaintiff reported improved symptoms and feeling better overall. (R. 404). NP Brooks noted improvement in Plaintiff's voice, mood, and affect. (R. 405). Her judgment continued to be impaired but was improving. (*Id*.) Her current medications were continued. (R. 406).

Plaintiff treated with Counselor Stephanie Tompkins in June and July 2019. (R. 402, 419, 571). These sessions covered several of Plaintiff's areas of concern. Plaintiff stated she wanted to be financially stable so she could regain custody of her children. (R. 402). She also expressed having several stressors, including her mother's terminal illness, lasting effects of childhood trauma, and relationship issues. (R. 419).

Plaintiff continued to follow-up with NP Brooks for medication management in July, September, and October 2020. (R. 556, 559, 567). In July, Plaintiff reported improved mood and

symptoms. (*Id*.) She rated her depression as 0/10 and anxiety 4/10. (*Id*.) NP Brooks continued to describe Plaintiff's insight and judgment as impaired, but also noted they were stable. (R. 569). NP Brooks ordered refills for Plaintiff's medications. (*Id*.) At the September appointment, she continued to report doing well on her medications, but she expressed frustration over gaining weight. (R. 567). NP Brooks discontinued Depakote and prescribed Topamax in its place. (R. 561). Otherwise, Plaintiff's medications remained unchanged. (*Id*.) In October, Plaintiff again reported doing well and denied any mood swings despite rating them as 3/10. (R. 556). She gave the same rating for her anxiety and denied any depression. (*Id*.) Being on Topamax was helping with issues concerning weight gain. (*Id*.) NP Brooks noted that Plaintiff's mood, affect, and judgment remained the same. (R. 558).

*Consultative Exams*

In February 2018, Plaintiff saw Dr. Robbins-Brinson for a consultative mental status evaluation in connection with a previous application. (Ex. 2F). Plaintiff explained that she had "a hard time staying calm and controlling [her] moods." (R. 345). Plaintiff stated she was "depressed and sad" at the interview. (R. 346). At the time, Plaintiff had two children, the oldest of whom lived with the child's father, while Plaintiff's mother had custody of the youngest. (R. 345). Plaintiff stated that she did not have custody due to her mental and financial instability. (*Id*.) Plaintiff left school in the 9th grade and denied being in special education classes or repeating a grade. (*Id*.) At the time of the evaluation, Plaintiff was not receiving any psychiatric treatment or taking medications, for which she gave varying justifications. (R. 345, 347). She discussed her 2017 REBH hospitalization, but she disclosed no major severe stress happening in her life at the time of the evaluation. (R. 345).

When Plaintiff saw Dr. Robbins-Brinson, Plaintiff was living with her boyfriend in an apartment and had no issues attending to her personal care and finances. (R. 346). However, she disclosed trouble sleeping and appetite issues dependent upon her marijuana usage. (*Id.*) Dr. Robbins-Brinson found Plaintiff a good reporter of her daily activities and situation without minimizing her abilities, but she found that Plaintiff "may be under reporting drug use behavior." (R. 346-347). In speaking with Plaintiff, Dr. Robbins-Brinson found Plaintiff's speech and eye contact to be normal. (R. 346). Plaintiff's thought processes were also normal and coherent, although she rambled at times. (*Id.*) Her ability to concentrate was limited due to constant crying spells. (*Id.*) Plaintiff oriented to time and place, and her memories appeared intact. (R. 347). Her judgment was fair. (*Id.*) While Plaintiff reported and described chronic depression, she was acutely experiencing emotions related to recently losing a pregnancy. (*Id.*)

Dr. Robbins-Brinson suggested diagnoses of moderate major depressive disorder with anxious distress and moderate cannabis use disorder. (*Id.*) She found that Plaintiff had a fair ability to function and had ability to understand and carry out simple instructions, although her ability to sustain focus was variable. (*Id.*) Plaintiff had a fair ability to get along with others. (*Id.*) Dr. Robbins-Brinson opined that Plaintiff's recovery was "fair to poor" due to substance abuse and lack of treatment. (*Id.*) This opinion led Dr. Robbins-Brinson to limit Plaintiff's ability to manage any awarded disability funds. (*Id.*)

In conjunction with the current application, Plaintiff saw Dr. Foster in January 2020 for a consultative psychological examination. (Ex. 5F). Plaintiff disclosed a struggle with homelessness, her 2017 REBH hospitalization, and losing a pregnancy after experiencing domestic abuse. (R. 396-397). At the time, she was living with a friend and cleaning and doing other chores as room and board. (R. 397). She reported having no treatment in over a year and taking Venlafaxine. (R.

397, 399). She reported that she dropped out of school in the 9th grade and never completed her GED. (*Id*.) She said she worked in grocery store three years prior but had to quit because she had panic attacks in which she yelled and threw things at people. (*Id*.) She stated she infrequently drank alcohol but "acknowledged using marijuana 'as much as I can get it.'" (*Id*.) She explained that her mother had guardianship of her children because Plaintiff was unable to care for them. (*Id*.)

Dr. Foster found Plaintiff to be alert and oriented despite appearing fatigued. (*Id*.) Her speech was rapid, and she tended to go into unrelated conversations. (R. 398). Her mood was anxious and switched from being tearful and to jovial. (*Id*.) However, these mood issues did not impact Plaintiff's ability to participate in the exam and assessments. (*Id*.) Therefore, Dr. Foster found Plaintiff accurately reflected her mental status. (*Id*.) The assessment of her Full Scale IQ (FSIQ) resulted in a score of 66, which placed Plaintiff in the mentally deficient range. (*Id*.) Plaintiff showed borderline range functioning in areas "requiring abstract verbal reasoning, expressive vocabulary knowledge, and general fund information." (*Id*.) Plaintiff reads on a 6th grade level and has math skills within a 4th grade level. (R. 399). Both areas scored within a borderline range. (*Id*.)

Dr. Foster assessed Plaintiff with PTSD, bipolar disorder, and borderline intellectual function. (*Id*.) Plaintiff's lack of treatment limited her ability to cope with issues related to these diagnoses. (R. 400). He believed Plaintiff would display dramatic behavior when moderately stressed or overwhelmed. (*Id*.) He moderately limited Plaintiff's ability to complete simple tasks. (*Id*.) Her stressors and inability to cope would greatly limit Plaintiff's ability to deal with others. However, Dr. Foster did not believe Plaintiff would require assistance handling any awarded benefits. (*Id*.)

*Hearing Testimony and Function Reports*

At the time of the hearing, Plaintiff was 38 years old, unmarried, and living with a roommate. (R. 39). She had not renewed her driver's license and testified that her anxiety made her afraid to drive. (R. 39-40). She completed 8th grade and stated that she received a diploma or GED from an unaccredited private school. (R. 40, 49-50). She denied being able to handle money well or understand what change she would receive back from a simple purchase. (R. 40-41). She denied a current issue with alcohol or drugs. (R. 42). She testified to having recurrent sleep issues due to panic attacks accompanied by waking up screaming and crying. (*Id.*)

When asked about her current depression symptoms, Plaintiff testified that she had difficulty getting out of bed, appetite issues, and negative thoughts about life. (R. 42). She did not understand the underlying cause of her panic attacks and anxiety, but she explained the panic attacks made it hard to breathe and hurt her chest. (*Id.*) Sometimes, the panic attacks and anxiety caused Plaintiff to not want to leave home. (R. 44-45). She experienced these attacks daily. (R. 45). Plaintiff also testified that she sometimes has audio and visual hallucinations. (R. 46). She described not being able to be around her children or family and how she simply erupts into crying spells. (R. 47-48). Plaintiff described her past treatment at REBH and current treatment at First Choice Primary with NP Brooks. (R. 45-46, 49). At the time of the hearing, she reported taking Topamax and Prozac without side effects. (R. 42-43).

Plaintiff completed a function report in June 2020, which largely mirrors her hearing testimony. (Ex. 7E). However, Plaintiff also listed back pain as a reason for her inability to work and suggested that she must be reminded to take her medications. (R. 231, 233, 236).

## DISABILITY EVALUATION

Following the five-step sequential evaluation process, the reviewing ALJ made the following findings in this case. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since August 23, 2019, her application date. (R. 17). At step two, the ALJ found that Plaintiff suffered from the following severe impairments: major depressive disorder, bipolar disorder, generalized anxiety disorder, and borderline intellectual functioning. (*Id.*) The ALJ also found that Plaintiff suffered from post-traumatic stress disorder (PTSD), alcohol use disorder, marijuana abuse, and tobacco use disorder, but found that these impairments were non-severe. (*Id.*) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments meeting or medically equaling the severity of one of the listed impairments, after specifically considering listings 12.04, 12.06, 12.08, 12.11, and 12.15. (R. 18-19). Therefore, the ALJ assessed Plaintiff's RFC and determined that Plaintiff could perform a full range of work at all exertional levels, with the following non-exertional limitations:

> [The claimant can have] no more than occasional contact with the general public and no more than occasional "team-type" interaction with co-workers; limited to performing simple routine unskilled tasks that can be learned from short demonstration up to a one month period of training; and the need to avoid fast paced production rate assembly line style work activities.

(R. 19).

Based on this RFC, the ALJ found at step four that Plaintiff is not capable of performing any past relevant work. (R. 23). Pursuant to step five, the ALJ determined that there are jobs existing which Plaintiff can perform, including marker, folder, office helper, document preparer, addressing clerk, and surveillance system monitor. (R. 24). As a result, the ALJ determined that

Plaintiff was not disabled within the meaning of the Social Security Act at any time from August 23, 2019, through the date of the decision. (R. 25).

## ANALYSIS

Plaintiff argues that ALJ failed to view the medical record as whole when determining Plaintiff's RFC and that the decision is therefore not supported by substantial evidence. (Doc. 13). She asserts that there is a disconnect among Dr. Foster's findings, the results of the ALJ's Psychiatric Review Technique (PRTF) findings at step three, and the limitations accounted for in the RFC. (*Id*.) A review of the decision and record shows that the ALJ applied the correct legal standards to the medical records and opinions, adequately discussed the record, and adequately articulated her reasoning throughout the decision. There is no error in how the ALJ arrived at the RFC, and the decision is supported by substantial evidence. There is no basis for remanding Plaintiff's case.

Plaintiff suggests that ALJ did not appropriately consider the results of Dr. Foster's consultative examination and failed to explain why the results were not accounted for in Plaintiff's RFC. (Doc. 13). She argues that an ALJ must adequately explain "genuine inconsistencies" between treatment records and a treating physician's statement. (*Id.*, p. 4). While Plaintiff does not specifically cite the "treating physician rule," her assertion that Dr. Foster's opinion was entitled to specific consideration as a treating or examining physician is misplaced as the treating physical rule no longer applies.

For applications filed on or after March 27, 2017, there is no requirement to give treating physicians deference. *See* 20 C.F.R. § 416.920c. Plaintiff filed her application for benefits in August 2019. The weight given to all medical opinion evidence – even those opinions from Plaintiff's own treating physicians – is now governed by 20 C.F.R. § 416.920c. Under these

11

regulations, the agency no longer defers or gives any specific evidentiary weight to any medical opinion, even those from a claimant's own medical sources. 20 C.F.R. § 416.920c(a). The decision instead must articulate how persuasive the medical opinions and prior administrative findings were found to be. 20 C.F.R. § 416.920c(b). The decision is not required to articulate the determination for each and every record, however, and instead may discuss the source of the opinion in a single analysis. 20 C.F.R. § 416.920c(b)(1). The following factors will be used to consider and weigh the record: supportability, consistency, relationship with the claimant, and specialization. 20 C.F.R. § 416.920c(c)(1)-(4). The most important factors are supportability and consistency, and the decision must state how these factors were considered in the disability determination. 20 C.F.R § 416.920c(b)(2).

These post-March 27, 2017 regulations do not change the requirement that the ALJ explain the factors considered with particularity. Otherwise, "'…it [would be] impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence.' [When] the ALJ fails 'to state with at least some measure of clarity the grounds for his decision,' [the Court] will decline to affirm 'simply because some rational might have supported the ALJ's conclusion.'" *Winschel*, 631 F.2d at 1179 (citations omitted). After reviewing the decision, the ALJ correctly identified and applied the applicable legal standards to the entire medical record, and the decision adequately explains the findings and conclusions.

The ALJ correctly summarized Dr. Foster's findings before labeling the opinion "somewhat persuasive" based on the examination results showing moderate limitations and their consistency with other treatment notes. (R. 22). The ALJ not only listed the reasoning for her evaluation of Dr. Foster's opinion in terms of the entire record, but she also discussed the previous consultative exam by Dr. Robbins-Brinson. (R. 22-23). This discussion included specific

references to Plaintiff's treatment at First Choice Primary care, which did show improvement with medication, with comparison to Plaintiff's description of her symptoms. The ALJ ultimately found that the record did not support Plaintiff's described limitations and that her RFC did not require more restrictive findings than the ones the ALJ included.

Next, Plaintiff raises potential error with how the ALJ arrived at Plaintiff's RFC despite finding that Plaintiff had moderate limitations in each category of the PRTF at step 3. (Doc. 13, p. 4-8). The ALJ correctly noted that the PRTF is used at steps 2 and 3 and is not to be used to formulate an RFC. (R. 19). Plaintiff does not dispute the ALJ's consideration of her abilities at steps 2 and 3, but instead argues that the ALJ was required to expand those findings at steps 4 and 5 to develop an RFC inclusive of Plaintiff's limitations and one which is thus supported by substantial evidence. (*Id.*, p. 4-8).

The ALJ recognized Plaintiff's severe impairments were major depressive disorder, bipolar disorder, generalized anxiety disorder, and borderline intellectual functioning. As discussed above, the ALJ appropriately considered Plaintiff's mental health limitations and symptoms based on the record. The case on which Plaintiff chiefly relies to argue that the ALJ's RFC formulation is deficient, *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245 (11th Cir. 2019), is distinguishable from Plaintiff's case. First, unlike in *Schink*, the ALJ here did not ignore Plaintiff's mental health impairments and did classify Plaintiff's mental health impairments as severe. Next, as discussed below, the ALJ accounted in the RFC for the limitations that she found supported by the record and gave specific reasons by noting Plaintiff's treatment record.

Plaintiff also highlights *Samuels v. Acting Comm'r of Soc. Security*, 959 F.3d 1042 (11th Cir. 2020), to show that the ALJ did not properly incorporate Plaintiff's limitations into the hypothetical posed to the vocational expert (VE). The Eleventh Circuit remanded *Samuels* based

upon its *Schink* decision and the ALJ's failure to incorporate the episodic nature of Plaintiff's bipolar disorder into the hearing hypotheticals. *Samuels*, 959 F.3d at 1046-1047. Unlike in *Samuels*, the ALJ's questioning of the VE in this case indicates that the ALJ incorporated the record-supported limitations, such as limiting interaction with the public; minimizing the amount and type of interaction with co-workers; limiting work to simple, routine, unskilled tasks; restricting fast paced production rates; and outlining the minimum amount of training required. (R. 51). The ALJ did not ignore the limitations for which Plaintiff now argues, but actually posed Plaintiff's bipolar-related symptoms to the VE in the second hypothetical. (R. 53). In formulating an RFC, an ALJ is not required to include limitations in the RFC that she rejects as not supported by the record. *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1161 (11th Cir. 2004). Neither *Schink* nor *Samuels* changes this tenet or divests the ALJ of the responsibility she has to assess the RFC. 20 C.FR. § 404.1546(c). The ALJ considered Plaintiff's limitations in the contexts of steps 2 and 3 and then at steps 4 and 5. The record then shows that the ALJ considered the limitations that Plaintiff's impairments may cause, but ultimately the ALJ did not find all of the limitations supported by the record. Again, the ALJ adequately articulated a basis for these findings. Therefore, the RFC is supported by substantial evidence.

## CONCLUSION

The ALJ clearly articulated an analysis of the objective treatment record sufficient to establish substantial evidence in support of the decision and to discount Plaintiff's subjective statements of severity. *See Brown v. Comm'r of Soc. Sec.*, 677 F. App'x 529, 531-532 (11th Cir. 2017). This decision is well articulated, and it shows the ALJ considered the record as a whole. There is no error with the manner in which the ALJ considered the consultative examiners'

opinions, Plaintiff's limitations, and resulting treatment of Plaintiff's mental health issues. The limitations included in the RFC are supported by substantial evidence.

Based on the foregoing, it is **ORDERED** that the Commissioner's decision be **AFFIRMED**.

**SO ORDERED**, this 24th day of March, 2023.

s/ Charles H. Weigle
Charles H. Weigle
United States Magistrate Judge